*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* R. SCHROLL, Minor.

UNPUBLISHED
February 05, 2026
12:10 PM

No. 375479
Calhoun Circuit Court
Family Division
LC No. 2023-001135-NA

*In re* DUNN/SCHROLL, Minors.

No. 375485
Calhoun Circuit Court
Family Division
LC No. 2023-001135-NA

Before: O'BRIEN, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

In these consolidated appeals,[1] in Docket No. 375479, respondent-father appeals as of right the trial court order terminating his parental rights to the minor child, RS, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and MCL 712A.19b(3)(j) (reasonable likelihood of harm). Respondent-father challenges the trial court's finding of statutory grounds for termination. In Docket No. 375485, respondent-mother appeals as of right the same order terminating her parental rights to RS, as well as her parental rights to her two other minor children, HD and CD, under MCL 712A.19b(3)(c)(*i*), MCL 712A.19b(3)(c)(*ii*) (other conditions exist), and MCL 712A.19b(3)(j). Respondent-mother challenges the trial court's findings that petitioner, the Department of Health and Human Services (DHHS), made reasonable efforts, given her cognitive disability. She also argues that the trial

---

[1] *In re R Schroll Minor; In re Dunn/Schroll Minors*, unpublished order of the Court of Appeals, entered May 14, 2025 (Docket Nos. 375479 and 375485).

court's finding that termination was in the children's best interests was clearly erroneous. We affirm.

## I. RELEVANT FACTS AND PROCEEDINGS

In April 2023, DHHS petitioned the trial court for an ex parte order to remove HD, CD, and RS from respondents' care, alleging physical and medical neglect of all three children. The petition highlighted developmental delays in RS and interruptions in HD's and CD's medical and mental-health services because of the family's frequent relocations. The petition expressed concerns that respondents' cognitive impairments affected their ability to meet the children's needs. After a preliminary hearing, the trial court authorized the petition, placed the children with DHHS for care and supervision, ordered that reasonable efforts to reunify the family were to be made, and allowed respondents supervised parenting time.

After nearly two years of hearings and services, a termination hearing was held over five days beginning in March 2025. When the termination hearing began, respondents were living in a one-bedroom apartment that they obtained in September 2024. But foster-care specialist Candace Williams, who took over the case in December 2024, testified that the apartment was not appropriate for 12-year-old HD and 10-year-old CD, who could not share a bedroom. She presumed, however, that the apartment would be appropriate should the trial court reunite RS with respondents. There was no dispute that respondents participated in numerous services and that they regularly attended parenting time. The issues central to the termination hearing were whether DHHS accommodated respondents' intellectual disabilities and cognitive impairments, whether respondents benefited from the services provided, and whether reunification would be possible if respondents were given more time to participate in and benefit from services.

Foster-care worker Carmen Davis testified about using the teach-back method to communicate with respondents, which involved reading information to respondents, explaining information, and having them repeat the information back to her. Davis testified that the Early On service providers and school personnel who met with respondent-mother and her to discuss HD's and CD's Individualized Education Programs used the teach-back method. Davis also testified that she discussed respondent-mother's limitations with all of respondent-mother's service and healthcare providers, and she said that the healthcare providers used language designed to help respondent-mother better understand medical issues. Foster-care specialist Williams also testified about how she presented material to respondents. She explained that respondents received Early On services at parenting times with RS that were designed to distill and help respondents practice what RS was learning in physical, occupational, and speech therapy.

Both foster-care worker Davis and foster-care specialist Williams testified that respondents did not benefit from the services provided. Despite attending multiple parenting classes, respondent-mother struggled with parenting skills without significant assistance. Williams provided examples of respondents' inability to internalize guidance, such as needing constant redirection to assist RS with physical activities. Davis noted respondent-father's developmental delay and intellectual disability, stating that no additional services could compensate for his cognitive delays. RS had significant developmental delays and a form of cerebral palsy. Both Davis and Williams testified that neither respondent understood RS's medical needs or could manage appointments, convey information about RS to the medical staff, or implement

recommendations. Both Davis and Williams opined that terminating respondents' parental rights was in the children's best interests, emphasizing the children's need for stability and permanency. HD and CD were together in a preadoptive placement, were bonded with their foster family, and were thriving. RS was in a new preadoptive placement, and although he had a bond with respondents, they struggled to meet his needs.

Respondent-mother emphasized her bond with the children and expressed her desire to reunite with them. She denied that domestic discord existed between her and respondent-father, insisted that none of her children wanted to be adopted, and stated that CD was lying if she said that respondent-father touched her inappropriately. Respondent-mother intended to stay with respondent-father despite the issues in their relationship.

The trial court ruled that DHHS had made active efforts toward reunification but that respondents failed to benefit from services. The court found statutory grounds for termination under MCL 712A.19b(3)(c)(*i*), (3)(c)(*ii*), and (3)(j), citing respondents' inability to care for the children and the risk of harm if they were returned home. The court determined that termination was in the children's best interests given their need for stability and respondents' failure to address concerns about abuse and neglect. The trial court entered an order terminating respondents' parental rights. Respondents now appeal.

## II. STANDARDS OF REVIEW

This Court reviews for clear error a trial court's decision that a ground for termination has been proven by clear and convincing evidence. *In re Keillor*, 325 Mich App 80, 85; 923 NW2d 617 (2018). See also MCR 3.977(K). Likewise, this Court reviews for clear error a trial court's decision that termination is in the child's best interest by a preponderance of the evidence. *In re Keillor*, 325 Mich App at 93. A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a "definite and firm conviction" that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks and citation omitted).

In termination cases, unpreserved issues are reviewed for plain error affecting substantial rights. *In re Pawloski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 372145); slip op at 4, order scheduling oral argument ___ Mich ___; 25 NW3d 671 (2025) (quotation marks, citations, and alteration brackets omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.*; slip op at 4-5 (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008). The asserting party "bears the burden of persuasion with respect to prejudice." *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 70 (2020) (quotation marks and citation omitted).

## III. DOCKET NO. 375479

Respondent-father contends that the trial court clearly erred by finding statutory grounds to terminate his parental rights when he substantially complied with his parent-agency treatment plan. We disagree.

As stated, the trial court terminated respondent-father's parental rights to RS under MCL 712A.19b(3)(c)(*i*) and (3)(j). MCL 712A.19b(3)(c)(*i*) supports termination when "182 or more days have elapsed since the issuance of an initial dispositional order" and the trial court finds by clear and convincing evidence that "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age."

It is undisputed that more than 182 days elapsed since issuance of the initial dispositional order in July 2023 and the termination hearing in March 2025. The conditions that led to respondent-father's adjudication were homelessness and parenting skills; specifically an inability to provide proper care and custody for RS. At the time of the termination hearing, respondents had lived for nearly six months in a one-bedroom apartment, which foster-care specialist Williams presumed was suitable for reunification with RS. The critical issue was whether respondent-father had sufficiently benefited from his treatment plan to be able to provide proper care for RS. Clear and convincing evidence supported the trial court's determination that he had not, nor could he be expected to do so within a reasonable time.

Respondent-father completed parenting classes and supportive visitation, regularly attended parenting time when he was in the county, was engaged in Early On services for RS, and received various services through Summit Pointe. Nevertheless, concerns remained about respondent-father's ability to parent.

The witnesses at the termination hearing consistently testified that neither respondent had demonstrated that he or she could provide the care that RS needed without substantial, ongoing assistance. Case service plans, as well as witness testimony, indicated that respondent could follow directions but lacked the capacity to incorporate guidance and initiate and complete tasks without direction. Case service plans also noted that respondents would "likely need continuous ongoing support to provide a proper safe environment with extensive community support" for the children's needs, including RS's extensive needs. Respondent-father relied on respondent-mother to provide food, clothing, and other items during parenting time. He also relied on respondent-mother to schedule and remind him of his own appointments, and he would not attend appointments without respondent-mother. Witnesses at the termination hearing acknowledged that respondent-father loved and was bonded to RS. Throughout the child protective proceeding, however, both respondents' progress with respect to parenting skills was consistently assessed as poor.

Respondent-father asserts on appeal that he met the recommendations in his psychological evaluation. The record does not support this assertion. Respondent-father's psychological evaluation concluded that his overall prognosis for developing the skills to parent independently was poor given his "lack of insight, intellectual deficits, and tendencies to deny problems." The evaluator stated that respondent-father would need to commit "to the process of therapy, engage fully in services, and make definitive changes." Witnesses testified, and the record supports, that none of these recommendations appeared to have been met. Respondent-father's therapy was interrupted by periodic moves out of Summit Pointe's service area. Respondent-father engaged in, but did not benefit from services, and there is no evidence that he made definitive changes. "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care or custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014).

-4-

On this record, we cannot say that the trial court clearly erred in determining that clear and convincing evidence established MCL 712A.19b(3)(c)(*i*) as a statutory basis for the termination of respondent-father's parental rights. "If the trial court did not clearly err by finding one statutory ground existed, then [this] one ground is sufficient to affirm the termination of respondent's parental rights." *In re Sanborn*, 337 Mich App 252, 273; 976 NW2d 44 (2021). Therefore, we need not consider the trial court's determination that clear and convincing evidence also established a ground for termination under MCL 712A.19b(3)(j).[2]

## IV. DOCKET NO. 375485

## A. REASONABLE EFFORTS

Respondent-mother contends that DHHS did not make the active efforts required in this case to accommodate her cognitive and intellectual disabilities. We disagree.

This issue is unpreserved because respondent-mother did not object or indicate that her services were inadequate. See *In re Atchley*, 341 Mich App 332, 337; 990 NW2d 685 (2022).

Under the probate code, DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c), and MCL 712A.19a(2). To satisfy its obligations to make reasonable efforts toward reunification, DHHS "must create a case service plan outlining the steps that it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks/Brown*, 500 Mich at 85-86. DHHS also has obligations under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., "that dovetail with its obligations under the Probate Code." *In re Hicks/Brown*, 500 Mich at 86. DHHS cannot meet its obligation to provide reasonable services if it does not accommodate a disability under the ADA. *Id*. When challenging the services offered on the basis that DHHS violated the ADA, a respondent must establish that he or she would have fared better if other services had been offered. See *In re Sanborn*, 337 Mich App at 266.

The record in the present case shows that DHHS was aware of respondent-mother's cognitive and intellectual disabilities. After the adjudication, DHHS prepared a joint parent-agency treatment plan for respondents. Foster-care worker Davis testified that she read the parent-agency treatment plans to respondent-mother, asked her to explain different sections of the parent-agency treatment plans in her own words, and gave her an opportunity to ask questions and offer suggestions about services. Davis also testified that she urged service providers to use the teach-back method with respondent-mother. In addition, Davis testified that, during their two-hour drive to parenting time, she talked with respondent-mother about how Davis could better help her, assisted respondent-mother with calendaring, and reviewed the dates for upcoming services. The

---

[2] Respondent-father does not challenge the trial court's finding that termination was in the children's best interests. As such, we may presume that the trial court did not clearly err by finding that a preponderance of the evidence established that termination of respondent-father's parental rights was in RS's best interests. See *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000).

record shows that Davis helped respondent-mother complete forms and prepare for RS's medical appointments; obtain, complete, and submit applications for housing and for services at Women's Co-Op and Summit Pointe; and obtain a post office box. Moreover, rather than overwhelming respondent-mother with RS's physical-therapy, occupational-therapy, and speech-therapy appointments, Early On distilled the lessons from those therapies and provided respondent-mother with hands-on training to implement the lessons.

Through Summit Pointe, respondent-mother received services to help her develop independence, insight, a support system, and a healthy lifestyle for herself and her family. Specifically, respondent-mother received medication services, vocational assistance, case service management at least once a month, and one-on-one peer support to help her with a range of activities. Respondent-mother was also referred to counseling at Summit Pointe to help her gain insight into her behaviors and their effect on her family.

Respondent-mother argues on appeal that DHHS did not make the required active efforts. As evidence supporting this argument, respondent-mother points to foster-care specialist Williams's testimony that she was unfamiliar with the teach-back method and to the absence of evidence that other service providers used the teach-back method. The record shows, however, that, although Williams testified at the termination hearing that she was unfamiliar with the teach-back method, Williams actually conveyed information to respondents in a manner consistent with the teach-back method, even if she did not label it as such. Williams testified that she read information to respondents, explained what it meant, and then asked them whether they understood and had them repeat the information back to her. Under questioning by the trial court, Williams affirmed that this was her method of conveying information, and the trial court identified Williams's practice as the teach-back method. To the extent that respondent-mother's argument relies on Williams's unfamiliarity with terminology while overlooking evidence indicating that Williams conveyed information in accordance with the teach-back method, her argument that DHHS failed to accommodate her cognitive and intellectual disabilities fails.

As to the second prong of respondent-mother's argument, whether the courses that respondent-mother took at the Women's Co-Op used the teach-back method cannot be determined from the record. Even so, foster-care worker Davis testified that the Women's Co-Op accommodated respondents by reading questions aloud to them so that they could answer verbally rather than in writing. Davis also testified that Early On workers and school personnel used the teach-back method and that she discussed respondent-mother's limitations with all of respondent-mother's service and healthcare providers, who used language designed to help respondent-mother better understand medical issues. When respondent-mother was not referred to a Nurturing Parenting Program because she did not understand the material, Davis provided an alternative means of conveying comparable information.

As the foregoing illustrates, the record contains substantial evidence that DHHS fulfilled its obligation under the ADA to "make reasonable modifications in polices, practices, or procedures" to accommodate respondent-mother's disabilities. *In re Sanborn*, 337 Mich App at 263 (quotation marks and citation omitted). Caseworkers used the teach-back method, along with pictures and every-day examples, to convey expectations to respondent-mother; urged respondent-mother's service providers to use the teach-back method or to otherwise instruct respondent-mother in a way that she could understand; referred respondent-mother to providers

with expertise in providing services to cognitively and intellectually impaired individuals, such as Summit Pointe and Early On; and attempted to provide alternative means of instruction whenever necessary. Given this record, the trial court did not plainly err by determining that DHHS met its obligation to accommodate respondent-mother's cognitive and intellectual disabilities and, therefore, that DHHS's efforts at reunification were reasonable under the circumstances.[3]

## B. BEST INTERESTS

Respondent-mother next argues that the trial court clearly erred by finding that termination of her parental rights was in the children's best interests, given the parent-child bonds, the older children's opposition to termination of her parental rights, and the trial court's reliance on unsworn statements from the lawyer-guardian ad litem (L-GAL) as the basis for its best-interest determination. Again, we disagree.

If the trial court finds "that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The trial court must find by a preponderance of the evidence that termination of parental rights is in a child's best interests. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). In making its best-interest determination, a trial court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home[.]" *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015) (brackets, quotation marks, and citation omitted). The court may also consider "the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption." *In re Sanborn*, 337 Mich App at 277. In making a best-interest determination, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "[I]f the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App at 715.

A preponderance of the evidence showed that termination of respondent-mother's parental rights was in RS's best interests. The record showed that respondent-mother was unable to help RS meet his normal developmental milestones, let alone understand and meet his ongoing medical needs. RS was nearly three years old at the time of the termination hearing and had been in foster care since he was nine months old. He was in a preadoptive placement that was meeting all his needs, and he was interacting well with the foster parents, their children, and the household pets. Given these facts, it was not clearly erroneous for the trial court to determine that termination of respondent-mother's parental rights was in RS's best interests.

---

[3] Apart from arguing that DHHS did not make the efforts required to accommodate her cognitive and intellectual disabilities, respondent-mother does not argue that the statutory grounds for termination were not proved. "The failure to brief the merits of an allegation of error is deemed an abandonment of the issue." *In re JS & SM*, 231 Mich App at 98. Therefore, we may assume for purposes of this appeal that the trial court did not clearly err by finding that clear and convincing evidence established at least one statutory ground for termination. See *id*. at 98-99.

As to HD and CD, HD vacillated regarding whether he wanted to be reunited with respondent-mother or adopted. HD indicated at his psychological evaluation that he wanted to go back home to respondent-mother. When questioned later by foster-care specialist Williams, HD said that he was "fine" staying with his foster family, concerned primarily that, if adopted, then he would never see respondent-mother or respondent-father again. CD, on the other hand, did not indicate at her psychological evaluation that she wanted to be reunited with respondent-mother, and she indicated to Williams that she felt safe in her foster home and wanted to be adopted.

Both children's psychological evaluations indicated that they had suffered from neglect and had experienced the world as a harsh, unsafe, and inconsistent place. Recommendations for both included developing a sense of trust in the adults in their lives. CD's psychological evaluation in particular indicated that she needed an environment that was structured and characterized by a high degree of supervision, consistency, support, with clearly defined rules, expectations, and consequences. CD needed "to experience this environment over a long period of time in order to internalize the adult world as a safe and consistent place that is able to meet her needs regularly." The record shows that respondent-mother was unable to provide herself with a stable environment, let alone a stable, consistent, environment that inspired trust. The trial court heard testimony that HD and CD were together in a preadoptive placement, where they felt safe, were bonded with their foster parents, and had their needs met. The foster home provided the longest period of stability that either child had ever known.

It was undisputed that the children were bonded with respondent-mother. However, the parent-child bond was only one factor for the trial court to consider when assessing the children's best interests. See *In re White*, 303 Mich App at 714. As the foregoing shows, respondent-mother's "parenting ability, the children's need for permanency, stability, and finality, and the advantages of the foster homes over the parent's home," *In re Gonzales/Martinez*, 310 Mich App at 434, as well as respondent-mother's inadequate benefit from her treatment plan, the children's well-being while in care, and the possibility of adoption were factors that weighed in favor of termination. Accordingly, the trial court did not clearly err when it concluded that termination of respondent-mother's parental rights was in the children's best interests.

Respondent-mother argues on appeal that the trial court's best-interest assessment was clearly erroneous because (1) she and the children had a strong bond; (2) she credibly testified that she took care of HD and CD before RS was born, she credibly denied the existence of any domestic violence, and there was no indication that she posed a threat to the children's safety; (3) HD and CD would be separated from RS under an adoption plan; and (4) the trial court based its determination decision in part on the L-GAL's unsworn statements made during closing arguments, in violation of respondent-mother's due-process rights. None of these arguments are persuasive.

As already noted, the strength of the parent-child bond is only one of several factors that a trial court must consider when determining a child's best interests. See *id*. Even considering respondent-mother's bond with her children, the preponderance of the evidence showed that termination was in the children's best interests. As to the credibility of respondent-mother's testimony, it is axiomatic that "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). The trial court found respondent-mother's denial of domestic violence to

be untruthful. Not only is this finding entitled to due regard, but it is also supported by our review of the record. As to HD and CD being separated from RS, although keeping siblings together is often in their best interests, it is not the absolute rule. If keeping siblings together is contrary to the best interests of an individual child, then the best interests of that child will control. See *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). In the present case, the trial court considered the age gap between RS and the two older children, as well as the fact that RS had been in care for most of his life, and concluded that keeping the half siblings together did not weigh against termination. The trial court's analysis comports with our analysis in *In re Olive/Metts*, and respondent-mother has given us no reason to disturb it.

As to respondent-mother's assertion that the trial court improperly relied on unsworn statements made by the L-GAL during her closing, our review of the record shows that testimony at the termination hearing provided the basis of the L-GAL's closing argument. The trial court asked the L-GAL whether HD had stated a preference regarding adoption and whether the children knew what adoption meant. The L-GAL answered, in essence, that the children loved respondent-mother, but that they would be fine with making their forever home somewhere where their physical and emotional needs were met. She also surmised that HD and CD understood what adoption meant. The L-GAL's responses comported with the hearing testimony of foster-care specialist Williams. Moreover, nothing in the trial court's ruling suggests that respondent-mother was prejudiced by the L-GAL's responses to the trial court's questions. The trial court acknowledged that HD once stated that he wanted to be returned to respondent-mother, referred to the children's needs as expressed in their psychological evaluations, observed their need for stability and finality, and noted that their placement provided them with the greatest stability that they had ever experienced. Under these circumstances, and in light of the grounds for the trial court's best-interest determination and ultimate ruling, respondent-mother has not shown a due-process violation.

Accordingly, we affirm the trial court's order terminating respondent-father's parental rights to RS in Docket No. 375479 and respondent-mother's parental rights to RS, HD, and CD in Docket No. 375485.

/s/ Colleen A. O'Brien
/s/ Christopher M. Murray
/s/ Anica Letica